UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JEANNETTE WHITEHEAD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:12CV1259 CDP |
| | ) |
| CAROLYN W. COLVIN,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This is an action for judicial review of the Commissioner's decision denying

Jeannette Whitehead's applications for disability insurance benefits under Title II

of the Act, 42 U.S.C. §§ 401 et seq., and for supplemental security income (SSI)

benefits based on disability under Title XVI of the Social Security Act, 42 U.S.C.

§§ 1381, et seq.  Sections 205(g) and 1631(c)(3) of the Act, 42 U.S.C. §§ 405(g)

and 1383(c)(3), provide for judicial review of a final decision of the

Commissioner.  Whitehead claims she is disabled because of lupus, depression,

and rheumatoid arthritis.  Because I find that the decision denying benefits was not

supported by substantial evidence, I will remand the decision of the

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  As such, she should be substituted for Michael J. Astrue as the defendant in this suit.  Fed. R. Civ. P. 25(d).

Commissioner.

## Procedural History

Whitehead protectively filed her applications for benefits on April 19, 2007

and May 3, 2007.  She claims disability beginning September 15, 2006.  On

September 22, 2009, following a hearing, an ALJ issued a decision that Whitehead

was not disabled.  The Appeals Council of the Social Security Administration

(SSA) denied her request for review on April 16, 2010.  Whitehead appealed that

decision to this Court, and the case was assigned to the Honorable Frederick R.

Buckles, United States Magistrate Judge, sitting by consent of the parties pursuant

to 28 U.S.C. § 636(c).  Jeannette Whitehead v. Michael Astrue, Case No.

4:10CV1066 FRB.  On September 7, 2011, Judge Buckles reversed the decision of

the Commissioner and remanded the case for further proceedings.  Whitehead v.

Astrue, 2011 WL 3943921, *22 (E.D. Mo. Sept. 7, 2011).  On May 7, 2012,

following a second hearing, a different ALJ found that Whitehead was not

disabled.  Whitehead did not appeal that decision to the Appeals Council.

Therefore, the decision of the ALJ stands as the final decision of the

Commissioner.

## Evidence Before the Administrative Law Judge

In his thorough 58-page opinion, Judge Buckles summarized all the

evidence before the ALJ and the Appeals Council at the time of the first decision. Id. at *1-*15.  I will not restate that evidence here; instead, I simply adopt and incorporate Judge Buckles' opinion and will discuss any specific evidence as necessary to address Whitehead's arguments.  The following supplemental evidence was submitted to the ALJ before the second decision was issued on May 7, 2012.[2]

## Medical Records

On October 18, 2009, Dr. Garriga, Whitehead's treating rheumatologist, noted that the results of Whitehead's urinalysis indicated that her "WBC (white blood cell) count low again; no need to change meds."  (Tr. 810).[3]

On March 22, 2010, Whitehead saw Dr. Garriga complaining of stiffness lasting all day, small red bumps on her arms, itching, difficulty swallowing, drowsiness due to medications, swelling in feet and hands, intermittent chest pain, shortness of breath, and abdominal pain.  Dr. Garriga noted a history of constant and worsening pain in both legs radiating from the hip, with frequent loss of balance when walking.  His review of symptoms indicated that Whitehead was positive for rash, medication side effects, hair loss, difficulty swallowing, dry

---

[2]The ALJ considered the supplemental evidence, as well as the evidence previously received, when she rendered her decision.

[3]Whitehead's WBC was 2.4, with a normal reference range of 4.0-10.5.  (Tr. 814).

mouth, depression, swelling, chest pain, and dyspnea.  Upon examination, Dr.

Garriga noted that Whitehead appeared alert, cooperative, and was not in distress.

Whitehead's heart rate, range of motion, and joints were normal, with no swollen

joints, tender points, or tight muscle groups.  Dr. Garriga diagnosed connective

tissue disease (CTD), no insurance, and depression.  He prescribed Naproxen and

a return visit in four months.  (Tr. 840-41).

On April 1, 2010, Whitehead presented to the Grace Hill clinic complaining

of pain.  She was seen by a nurse practitioner, who noted that Whitehead reported

no fatigue, fever, night sweats, cough, dyspnea, chest pain, or irregular heart beat

or palpitations.  The nurse reported a history of anxiety, lupus, and depression.

Whitehead stated she took Prednisone, Abilify, Effexor, and other unnamed

medications.  Upon examination, Whitehead was noted to be well nourished, well

developed, and hydrated, with normal respiratory and cardiovascular functions.

The nurse practitioner observed that Whitehead had mild changes in her hands due

to rheumatoid arthritis, resulting in moderate pain with motion, and commented

that Whitehead was "unable to [perform] bilateral hand squeeze due to pain."   The

nurse practitioner diagnosed "pain in joint involving multiple sites" and "anemia,

unspecified."  She ordered Vitamin D 25-Hydroxyl and complete blood count

(CBC) tests from the lab.  (Tr. 888-89).  Test results revealed high CBC, low

WBC, low hematocrit, and low iron.  The pathologist recommended additional studies to rule out iron deficiency.  (Tr. 891-99).

On July 26, 2010, Dr. Garriga noted that Whitehead's WBC was "very low; likely indicates a lupus flare."  He indicated that she needed CellCept if not allergic.  (Tr. 791).  Whitehead's lab results indicated a WBC count of 1.9, with elevated Sjogren's antibodies and Jo-1 Ab.  (Tr. 794).

Whitehead saw Dr. Garriga on August 30, 2010 complaining of stiffness, intermittent rash, lethargy due to medications, swelling in feet and hands, frequent need to urinate, and shortness of breath.  Review of symptoms was positive for rash, side effects from her medication, hair loss, difficulty swallowing, dry mouth, depression, swelling, chest pain, and dyspnea.  Upon examination, Dr. Garriga noted that Whitehead was alert, cooperative, and not in distress.  She had normal joints, with no swelling, tender spots, or tight muscle groups.  He diagnosed her with systemic lupus erythematosus (SLE) and microcytic anemia.  (Tr. 836).

On November 15, 2010, Whitehead told Dr. Garriga that she had a fever, drowsiness, vertigo, nausea, vomiting, diarrhea, difficulty swallowing liquids, swelling, a frequent urge to urinate, shortness of breath at rest, dry eyes, depression, dry mouth, hair loss, medication side effects, chest pain, and dyspnea. She also reported feeling swollen and that her hands "locked up."  Upon

examination, Dr. Garriga found that Whitehead was alert, cooperative, and in no distress.  Review of joints yielded normal results, with no swelling, tender spots, or tight muscle groups.  Dr. Garriga diagnosed her with SLE and noted that Whitehead's lack of insurance "hinders her care."  (Tr. 834-35).  On the urinalysis order submitted the same day, Dr. Garriga noted Whitehead's primary diagnosis of lupus with secondary diagnoses of Sjogren's syndrome and leukopenia.  (Tr. 784).

During her March 31, 2011 examination, Whitehead told Dr. Garriga that she had constant aching and weakness in her hands, stiffness, constant pain in her legs, and dyspnea with exertions.  She also reported a problem with her memory and stated that "she cannot remember what occurs in the books she reads." Review of symptoms was positive for fever, nodules on legs, medication side effects including drowsiness, hair loss, difficulty swallowing liquids, depression, swelling in hands and feet, intermittent chest pain, and shortness of breath with minimal exertion.  Whitehead's heart and lungs were normal, and examination of her joints revealed normal results with no swelling, tenderness, or tightness.  Dr. Garriga diagnosed Lupus with leukopenia and arthralgias, dyspnea, and memory loss.  He ordered blood tests.  (Tr. 832-33, 854).

Blood tests ordered by the Grace Hill clinic on April 7, 2011showed out of range CBC, WBC, hematocrit, and C-Reactive protein.  (Tr. 902-05).  Subsequent

tests on September 1, 2011 and December 14, 2011, showed low CBC.  (Tr. 905, 907).

Whitehead went to the Northwest Healthcare emergency room on February 15, 2012 complaining of high blood pressure, headache, and blurred vision. Examination revealed tenderness at C3-7 and a compromised range of motion in her neck.  Her examination was otherwise normal.  An x-ray was ordered, which revealed moderate to severe disc disease C3 through C7 with "osteoarthritis in face and uncovertebral joints" and "no significant encroachment on the right, some encroachment on the left at C4-C5."  The impression was degenerative disease of the cervical spine.  Whitehead was told that she has moderate to severe osteoarthritis in her neck.  She was given Vicodin and discharged the same day. (Tr. 918-28).

At her March 19, 2012 visit to Dr. Garriga, Whitehead reported being in constant pain.  Review of symptoms was positive for rash on her neck, back, and arms, drowsiness and "brain fog" from her medications, trouble swallowing liquids, swelling in hands and feet, chest pressure, and shortness of breath. Whitehead's heart and lungs were normal.  She had some tight muscle groups, but otherwise her joints were normal.  Dr. Garriga diagnosed her with lupus, stress, and diffuse myalgias, and advised her to get some sleep.  On March 21, 2012, after

reviewing Whitehead's blood work, he noted that her anemia had improved, but "autoantibodies still present.  Same plan."  (Tr. 972-74).  Her blood work revealed low WBC and elevated Sjogren's Anti-SS-A and Jo-1 Ab.  (Tr. 974-979).

Whitehead also submitted supplemental mental health treatment records from BJC Behavorial Health.  Psychiatrist Narayana Kosuri, D.O., saw Whitehead on June 10, 2010.  The interim history note states that Whitehead "want[s] to try some antidepressants now, so far she refused to take Meds b/c of nausea/vomiting.  She appeared mildly depressed without S.I."  He observed that Whitehead's general appearance and behavior were "fair" and that she was cooperative.  Whitehead reported being "mildly depressed" with a bad memory.  Her perceptions, speech, and psychomotor activity were all observed to be normal.  Whitehead was alert and oriented.  Dr. Kosuri assessed Whitehead as being mildly depressed and prescribed the antidepressant Celexa along with Hydroxyzine[4] and supportive psychotherapy.  (Tr. 940-42).

On August 26, 2010, Whitehead told Dr. Kosuri that her hallucinations "are better than before but has them mildly."  Her appearance was rated as "fair," and she was cooperative.  Whitehead reported her mood was "good."  She had

---

[4]Hydroxyzine is used to treat anxiety.  Medline Plus (last revised September 1, 2010) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682866.html>.

sustained attention and no delusions; however, Whitehead reported auditory and visual hallucinations.  Her speech was slowed and soft, but the tone was appropriate.  Whitehead's psychomotor activity and orientation were normal, and her intellect was average with fair insight and judgment.  Dr. Kosuri assessed Whitehead as stable and prescribed Abilify, Effexor, and Hydroxyzine.  (Tr. 943-45).

Dr. Kosuri did not see Whitehead again until December 30, 2010.  She reported being "out of meds for some time.  Started to see bugs, people, shadows, etc.  Sleep is bad.  Hears voices - vague."  Whitehead's appearance was fair, and she wore clean clothing and made fair eye contact.  She was cooperative and reported her mood was "ok."  She had sustained attention and no delusions.  She reported auditory and visual hallucinations.  Whitehead's speech and psychomotor activity were normal, and she seemed oriented.  Her insight and judgment were listed as fair.  Dr. Kosuri assessed Whitehead's condition as stable.  He continued her medications and instructed her to call the clinic or seek emergency help if she had side effects or became unstable.  He continued her medications and also prescribed Trazodone.  (Tr. 945-48).

On March 8, 2011, Whitehead told Dr. Kosuri that "she is scared and jumpy and feels something is going to happen. gets panicked and paranoia, get up in the

night.  Feels loneliness . . . ."  She described her mood as "ok."  Dr. Kosuri noted

Whitehead's appearance and eye contact were fair and her demeanor was pleasant

and cooperative.  She had paranoid ideations, and her speech was slowed and soft

but appropriate.  Whitehead appeared alert and oriented, with normal psychomotor

activity and fair insight and judgment.  Dr. Kosuri assessed Whitehead as needing

a medication adjustment, and he added Seroquel[5] to her prescribed list of drugs.

He also recommended supportive therapy.  (Tr. 948-51).

On May 5, 2011, Whitehead reported to Dr. Kosuri that she was "doing very

good, does not want to change her medications . . . ."  Dr. Kosuri noted a full

affect with Whitehead's examination within normal limits.  Whitehead's insight

and judgment improved to "good."  He assessed Whitehead as "stable" and

continued her medications.  (Tr. 951-54).

Whitehead next saw Dr. Kosuri on December 6, 2011.  The interim history

notes that Whitehead "is more depressed in this season, has more crying spells,

tiredness, less motivation, etc., since November.  Sleep is very poor, only few

hours . . . ."  Whitehead described her mood as depressed.  She was cooperative,

with good eye contact and a fair appearance.  Whitehead had sustained attention,

---

[5]Seroquel is used to treat depression.  Medline Plus (last revised November 15, 2012)
<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698019.html>.

was well-oriented, and not delusional.  Her perceptions were normal, but her speech was slowed and soft.  Her insight and judgment were observed to be good.  Dr. Kosuri diagnosed a medication adjustment was needed, so he decreased Whitehead's dosage of Seroquel and increased her dosage of Hydroxyzine.  Supportive therapy was recommended.  (Tr. 954-57).

On March 15, 2012, Whitehead reported "lots of family stress" to Dr. Kosuri.  She told him she was "ok but in pain."  Her examination was normal.  Dr. Kosuri assessed Whitehead as "under stress and back pain" and refilled her prescriptions.  (Tr. 957-60).

On April 10, 2012, Dr. Kosuri completed a mental residual functional capacity questionnaire in support of Whitehead's applications for benefits.  Dr. Kosuri indicated that he had been treating Whitehead every 2-3 months for the last 15-30 months.  He diagnosed Whitehead with major depressive disorder, recurrent, with psychotic features.  He assessed her current GAF at 55, the highest of the past year, and listed her treatment and response as "fair."  Whitehead's medications were said to cause drowsiness and fatigue.  Dr. Kosuri's clinical findings included poor concentration, no motivation, helplessness and worthlessness, loneliness, suicidal ideation, hearing voices, paranoia, and depression.  Dr. Kosuri stated Whitehead's prognosis was "guarded."

Whitehead's symptoms included loss of interest, decreased energy, hallucinations, thoughts of suicide, feelings of guilt or worthlessness, persistent anxiety, mood disturbance, difficulty thinking or concentrating, paranoid thinking or inappropriate suspiciousness, memory impairment, recurrent obsessions or compulsions, sleep disturbance, emotional withdrawal, recurrent panic attacks, a history of multiple physical symptoms (for which there are no organic findings) of several years duration that have caused the individual to take medicine frequently, see a physician often, and alter life patterns, persistent irrational fear of a specific object, activity, or situation, and involvement in activities that have a high probability of painful consequences which are not recognized.  (Tr. 983-84).

Dr. Kosuri opined that Whitehead was "seriously limited but not precluded" in the following work-related abilities: remember work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; maintain attention for two-hour segment; maintain regular attendance and be punctual; sustain an ordinary work routine without special supervision; make simple work-related decisions; ask simple questions or request assistance; accept instructions and respond appropriately to criticism; get along with others; respond appropriately to changes in the work setting; understand and remember detailed instructions; carry out detailed instructions; set realistic goals

or make plans independently of others; interact appropriately with the general

public; maintain socially appropriate behavior; travel in unfamiliar place; and, be

aware of normal hazards and take appropriate precautions.  Dr. Kosuri also opined

that Whitehead would be "unable to meet competitive standards" in the following

work-related abilities: work in coordination with or in proximity to others without

being distracted; complete a normal work period without interruptions from

psychologically based symptoms; perform at a consistent pace without an

unreasonable number of rest periods; deal with stress of semiskilled and skilled

work; and, deal with normal work stress.  He felt Whitehead would be "limited but

satisfactory" in the area of adhering to basic standards of neatness and cleanliness.

(Tr. 985-86).

　　　Dr. Kosuri stated that Whitehead's psychiatric condition exacerbated her

perception of pain in relation to her lupus and fibromyalgia.  He believed she

would be absent more than 4 days per month because of her impairments, and that

her impairment has lasted more than 12 months.  Dr. Kosuri said that Whitehead

was not a malingerer and that her impairments were reasonably consistent with the

described symptoms and functional limitations.  (Tr.  987).

<u>Testimony</u>

　　　Whitehead's supplemental hearing was held on April 16, 2012.  She

- 13 -

appeared in person, was represented by counsel, and testified as follows.

Whitehead lives in an apartment with her four children.  She went to Sanford

Brown college for some data entry classes.  Whitehead worked as a supervisor at

Quest Diagnostics.  She has a driver's license, but only drives "sometimes" due to

pain.  Her medications also make her "sleepy and dysfunctional."  Whitehead

testified that she filed for disability because she has lupus.  At first, she was able

to work with the disease, but the pain and swelling eventually forced her to quit.

She then became depressed.  As of the hearing date, Whitehead continued to have

these problems, but she also developed headaches and osteoarthritis.  Whitehead

also testified that rheumatoid arthritis causes "her hands [not to] work."  She says

the weather also affects her hands, and rain causes them to hurt worse.  However,

she did not want to take her pain medication because it makes her groggy.

Whitehead testified that she has "excruciating pain" from lupus and dry mouth,

dysphagia from Sjogren's syndrome.  She also has an overactive bladder.

Whitehead also testified that she is depressed.  She cries several times a day,

including during the hearing.  She takes medication, but she doesn't think it helps.

She thought she began seeing a psychiatrist in 2007, but she couldn't remember

the name of the doctor or the location of the office.

Whitehead testified that she does not sleep at night because she is in pain,

hears voices, and is afraid.  She also gets up constantly to use the bathroom.

Whitehead does not cook meals because she forgets to turn the stove off.  Her

children, mother, and sister-in-law all help her with daily activities such as

shopping, filling out paperwork, etc. because she has trouble remembering details

or understanding words.  Whitehead does not do laundry because she messes it up,

and she doesn't do dishes because she drops them.  She can't vacuum or mop

because of her hands.  Sometimes she goes to the grocery store by herself, but she

gets confused and forgets where she is so she doesn't go far by herself.  Whitehead

does not watch television.  She can no longer read books because she forgets what

she just read, so now she listens to gospel music.  When she goes out, she usually

visits her mom or sister.

Whitehead testified that she can only sit for 30-40 minutes before needing

to move around because her legs and knees start to hurt.  Walking hurts more than

standing, and she can only walk for about 15 minutes before she is in pain.  Her

back also hurts.  Whitehead does not carry or lift anything, and she lies down a

couple of hours each day.

Dolores Gonzalez, a vocational expert, also testified at the hearing.  The

ALJ posed the following hypothetical to the vocational expert:

Q: The medical records and the claimant's testimony suggest that she

is functionally limited to light exertional work.  In addition, she
should avoid fumes, odors, dust, gas, hazardous heights, ropes,
ladders, and scaffolding; is limited to unskilled work; should not
perform work that includes more than infrequent handling of
customer complaints.  With those limitations, can the claimant
perform any of her past relevant work?

A: No, your honor.

Q: Are there any jobs that exist in significant number on a national
and state level that a hypothetical individual with the same
educational or vocational background and residual functional
capacity as the claimant has the ability to perform that exist in
significant numbers?  If yes, what would those jobs be? . . .

A: Mail sorter . . . Hand presser . . . A bench assembler . . . .

Whitehead's counsel asked the vocational expert the following questions:

Q: If we have a claimant same age, education, work background as
our claimant who . . . can sit about two hours in an eight-hour
workday and stand and walk less than two hours in an eight-hour
workday, any jobs available with those limitations?

A: No.

Q: The jobs you've listed, the mail sorter, hand presser, bench
assembly, how many days per month could an employee miss in these
jobs and still maintain that employment?

A:  . . . I would expect that if a person would miss two days out of the
month, that the person would have great difficulty maintaining
employment.

Q: If the claimant were credible, and as she testified, she would cry
throughout the day, need an unscheduled break for crying, and jobs
allow for unscheduled breaks?

- 16 -

A: No, the person would need to be accommodated, and therefore not able to work competitively.

(Tr. 561-89).

## **Legal Standard**

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion. Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, id., or because the court would have decided the case differently. Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992). In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it." Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000) (quoting Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999)). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. Pearsall v. Massanari, 274 F.3d

1211, 1217 (8th Cir. 2001) (internal citation omitted).

To determine whether the decision is supported by substantial evidence, the

Court is required to review the administrative record as a whole and to consider:

(1) the credibility findings made by the Administrative Law Judge;

(2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians;

(4) the plaintiff's subjective complaints relating to exertional and non-exertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts, when required, which is based upon a proper hypothetical question.

Brand v. Secretary of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th

Cir. 1980).

Disability is defined in social security regulations as the inability to engage

in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than twelve

months.  § 42 U.S.C. 416(i)(1); § 42 U.S.C. 1382c(a)(3)(A); § 20 C.F.R.

404.1505(a); 20 C.F.R. 416.905(a).  In determining whether a claimant is disabled,

the Commissioner must evaluate the claim using a five step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity.  If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities.  If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work.  If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy.  If not, the Commissioner declares the claimant disabled.  § 20 C.F.R. 404.1520; § 20 C.F.R. 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence.  <u>Basinger v. Heckler</u>, 725 F.2d 1166, 1169 (8th Cir. 1984).  The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole.  <u>See e.g.</u>, <u>Battles v. Sullivan</u>, 902 F.2d 657, 660 (8th Cir. 1990).  In considering the subjective complaints, the ALJ is required to consider the factors set out by <u>Polaski v. Heckler</u>, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.

<u>Id.</u> at 1322.  When an ALJ explicitly finds that the claimant's testimony is not credible and gives good reasons for the findings, the court will usually defer to the ALJ's finding.  <u>Casey v. Astrue</u> 503 F.3d 687, 696 (8th Cir. 2007).  However, the ALJ retains the responsibility of developing a full and fair record in the non-adversarial administrative proceeding.  <u>Hildebrand v. Barnhart</u>, 302 F.3d 836, 838 (8th Cir. 2002).

- 20 -

## The ALJ's Findings

The ALJ issued her decision that Whitehead was not disabled on May 7, 2012.  She found that Whitehead had the severe impairments of lupus, Sjogren's syndrome, and depression.   In reaching her conclusion that Whitehead does not have an impairment or combination of impairments that either meet or medically equal one of the listings, the ALJ reviewed the medical evidence of record submitted in the prior hearing as well as the supplemental evidence.  The ALJ found that Whitehead retained the residual functional capacity to perform light work, including lifting twenty pounds occasionally and ten pounds frequently, standing and walking six hours in an eight-hour workday and sitting six hours in an eight-hour workday; however, she must avoid the use of ropes, ladders, and scaffolds, and the hazards of heights, exposure to fumes, odors, dust and gasses; and is limited to unskilled work, defined as understanding, remembering, and carrying out simple instructions, and should not perform work which includes more than infrequent handling of customer complaints.  In fashioning Whitehead's RFC, the ALJ determined that her impairments could be expected to produce some of her alleged symptoms; however, she concluded that Whitehead's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible to the extent they were inconsistent with her RFC.  After

- 21 -

finding that Whitehead was unable to perform her past relevant work, the ALJ relied on the vocational expert's testimony and concluded that Whitehead was not disabled.

## Discussion

Whitehead's primary complaint is that the ALJ did not comply with Judge Buckles' remand Order because she failed to perform a credibility analysis consistent with the standards set out in Polaski.  Judge Buckles decided that remand was required, in part because "it cannot be said that the ALJ demonstrated in his written decision that he considered all of the evidence relevant to plaintiff's complaints or that the evidence he considered so contradicted plaintiff's subjective complaints that her testimony could be discounted as not credible."  Whitehead, 2011 WL 3943921, at *21.  Judge Buckles directed the ALJ on remand to "examine the possibility that plaintiff's mental impairment aggravated her perception of pain."  Id.  Whitehead contends that, on remand, the ALJ improperly disregarded her mental impairment's impact on her perception of pain and concluded that she was, instead, motivated by financial gain.[6]  The ALJ found as follows:

This is the claimant's third application for disability benefits.  In fact,

_____

[6]The ALJ did not find that Whitehead was a malingerer.

- 22 -

immediately after her first denial she went to work with little or no decline in earnings.  In fact, immediately after her first denial, the claimant obtained her job at Quest Diagnostics where she rose to the second-highest supervisor at the facility.  Her story about her disability and limitations was significantly different at the prior hearing reporting she could lift five to ten pounds, not a complete inability to lift any weight, and a maximum of fifteen minutes sitting and five minutes walking or standing.  While the District Court noted that one could not always discredit a claimant's testimony based on a blanket presumption of motivation for secondary gain, these discrepancies show the claimant tried to make herself appear as severely limited as possible, but she could not remember what limitations she had reported earlier in order to maintain a consistent story.  In this case the Administrative Law Judge concludes it is appropriate to note a significant motivation for secondary gain in contrast to the District Court Decision, because it is based on these inconsistencies and other factors, and not just an unsupported assertion of fact.  The undersigned has considered all of the factors required in Polaski and the testimony of the claimant and her responses to questioning at this hearing and the record as a whole to include her responses at the prior hearing.  Finally, in addition to the inconsistencies and other factors considered, the treatment records of the claimant's treating rheumatologist, Dr. Garriga contain almost no clinical findings consistent with the crippling limitations alleged by the claimant.  Thus, not only is there a motivation for secondary gain shown by multiple findings followed by returning to work after rejections, but the claimant's own doctor reported scant clinical findings on examination of the claimant from the earliest office notes reports of his clinical findings.  It is, in fact, the combination of many factors that limit the reliability of the claimant's statements and makes them appear to be motivated by secondary gain which the undersigned considers a significant factor in evaluating credibility.

(Tr. 545).

When determining the credibility of a claimant's subjective complaints, the

ALJ must consider all evidence relating to the complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions.  Halverson v. Astrue, 600 F.3d 922, 931 (8th Cir. 2010); Polaski, 739 F.2d at 1322.  While an ALJ need not explicitly discuss each Polaski factor in his decision, he nevertheless must acknowledge and consider these factors before discounting a claimant's subjective complaints.  Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010).

"[T]he duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints . . . under the Polaski standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible."  Masterson v. Barnhart, 363 F.3d 731, 738–39 (8th Cir. 2004).  It is not enough that the record merely contain inconsistencies.  Instead, the ALJ must specifically demonstrate in his decision that he considered all of the evidence.  Id. at 738; see also Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991).  Where an ALJ explicitly considers the Polaski factors but then discredits a claimant's complaints for good reason, the decision should be upheld.  Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001).

The determination of a claimant's credibility is for the Commissioner, not the Court, to make.  Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).  As Judge Buckles previously acknowledged, "a claimant's financial motivation may contribute to an adverse credibility determination when other factors cast doubt upon the claimant's credibility."  Ramirez v. Barnhart, 292 F.3d 576, 581-82 n.4 (8th Cir. 2002).

Here, the ALJ determined that financial motivation was a significant factor detracting from Whitehead's credibility based upon perceived inconsistencies in Whitehead's testimony and medical records, alleged lack of objective medical evidence supporting the extent of her complaints, her alleged noncompliance with treatment, and her ability to work in the past despite her attempts to claim pain and seek benefits.  The ALJ did not, however, discuss any of the evidence suggesting that Whitehead's perception of pain was aggravated by her mental impairment, contrary to Judge Buckles' remand Order.  In doing so, the ALJ substantially erred.  Remand is therefore required.

Dr. Rosso, Whitehead's consultative psychologist, opined on June 18, 2007, that Whitehead's "level of cognitive functioning has declined" and that it "may be related to her significant depression."  He further diagnosed her with "significant depression, which she reports began after she had been diagnosed with Lupus."

- 25 -

(Tr. 356).  Dr. Garriga, Whitehead's treating physician, indicated in the residual functional capacity questionnaire that he completed on January 18, 2008, that Whitehead's symptoms included pain, and that psychological factors, including depression and anxiety, affected her physical condition.  (Tr. 296).  On July 14, 2009, he also indicated that Whitehead's depression would limit her ability to work.  (Tr. 494).  On October 23, 2009, clinical social worker Mary McBride, who had met with Whitehead at least two times per week for two months before completing her evaluation, stated that Whitehead "is not able to deal effectively with her pain from Lupus due to heightened depression and hopelessness.  Her depression makes her feel more physical pain." (Tr. 531).  Dr. Kosuri, Whitehead's treating psychiatrist, also confirmed in April of 2012 that Whitehead's psychiatric condition exacerbated her perception of pain and her physical symptoms.  (Tr. 987).

The ALJ ignored this evidence of record, instead finding that Whitehead's credibility was diminished because Whitehead could produce no documents demonstrating that she sought "mental health treatment"until her hospitalization on March 6, 2009.  According to the ALJ, Whitehead was not credible in part because she told Dr. Rosso that "she had just begun to take psychotropic medication" even though she had not yet been admitted to the psychiatric hospital.  The ALJ then

concludes, "Thus, the claimant never had professional mental health treatment."

This finding is contrary to the substantial evidence of record as a whole.  While

Whitehead could not produce documents verifying her claim that she began seeing

a psychiatrist in 2007 (apparently because the doctor refused to cooperate with the

request), the record is replete with evidence that Whitehead was diagnosed with,

and treated for, depression by  Dr. Garriga as early as April 8, 2005, when he

prescribed her the antidepressant Nortriptyline.  Whitehead's depression was again

noted by Dr. Garriga on November 8, 2005, and subsequently on March 29, 2006,

when he prescribed her the antidepressant Lexapro.  Whitehead returned to Dr.

Garriga on September 6, 2006, complaining of depression, and depression was

again noted during her visit of January 8, 2007.  On April 24, 2007, Dr. Garriga

prescribed Whitehead the antidepressant Zoloft, and depression was noted during

her visit of May 30, 2007.  Consultative psychologist Dr. Rosso diagnosed

Whitehead with major depressive disorder on June 27, 2007, and consultative

physician Dr. Khalifa also diagnosed her with depression (stable) on July 13, 2007.

 Dr. Garriga prescribed Vivactil for Whitehead's depression during that visit.  Dr.

Garriga again noted Whitehead's diagnosis of depression on September 21, 2007,

which he verified in his physical residual functional capacity questionnaire

completed on January 18, 2008.  Three days later, Dr. Garriga diagnosed

Whitehead with depression.  Dr. Spezia prescribed Whitehead Lexapro on July 30,

2008.  On October 10, 2008, Dr. Garriga noted that Whitehead was taking

Cymbalta for depression.  Dr. Garriga diagnosed Whitehead with major depressive

disorder on March 6, 2009, while she was currently taking Cymbalta and

Trazodone, and urged her to see a psychiatrist.

This extensive medical history, all of which occurred <u>before</u> Whitehead's

June 10, 2009 admission to the Metropolitan St. Louis Psychiatric Center,

demonstrates that Whitehead had been diagnosed with depression by two treating

physicians and two consultative examiners (one of which is a mental health

specialist), and that she had been treated for depression with antidepressants since

2005, well before her claimed onset date.  The ALJ's erroneous conclusion that

Whitehead could not have been taking psychotropic medications when she was

seen by Dr. Rosso (and therefore was less credible because she told him so) is flatly

contradicted by the evidence, which shows that Whitehead had just started taking

the psychotropic antidepressant Zoloft about two months before her examination.

Moreover, that Whitehead could not prove that she was seeing a psychiatrist during

this time period does not mean that she was not seeking — and receiving —

"mental health treatment."  Treatment by a physician for depression <u>is</u> mental

health treatment.  <u>See</u>, <u>e.g.</u>, <u>Brubaker v. Astrue</u>, 2011 WL 1256943, *9 (D.S.D.

Mar. 30, 2011) (treatment for depression and anxiety by general practice doctors

constitutes mental health counseling).[7]

The ALJ substantially erred when she concluded that Whitehead lacked

"significant mental health problems [because] she never sought treatment until

2009" and that her "credibility [was] questionable regarding her reported history of

mental health treatment . . . ." These findings are not supported by substantial

evidence on the record as a whole. "The ALJ must not substitute his opinions for

those of the physician." Ness v. Sullivan, 904 F.2d 432, 435 (8th Cir. 1990). The

course and manner of treatment is for the treating physician to decide, not the ALJ.

Id. Here, Whitehead had been receiving treatment for her depression since 2005,

and it is not for the ALJ to speculate about what treatment should, or should not,

have occurred.

The ALJ also erred when she ignored the more recent evidence of

Whitehead's mental impairment provided by her treating psychiatrist Dr. Kosuri,

---

[7]While it is certainly true that a specialist's opinion in the field of mental health would ordinarily be entitled to greater weight than Dr. Garriga's opinion, see Brown v. Astrue, 611 F.3d 941, 953-54 (8th Cir. 2010), it does not follow that only a mental health specialist such as a psychiatrist can render "mental health treatment." Courts routinely review the diagnosis and treatment of depression and other mental impairments by non-specialist physicians in disability cases. See id. It is also important to note that here, the ALJ was not choosing between contrary opinions of a mental health specialist and a non-specialist when she concluded that Whitehead had no significant mental health problems due to the lack of mental health treatment until 2009. Instead, Dr. Garriga's diagnosis and treatment of Whitehead's depression is consistent with the opinions of mental health specialists Drs. Rosso and Kosuri.

who opined on April 10, 2012, that Whitehead suffered from major depressive disorder, recurrent, with psychotic features, and that her psychiatric condition (which he described as "guarded") exacerbated her perception of pain.  Later in her opinion the ALJ briefly mentions Dr. Kosuri's mental residual functional capacity questionnaire and even relies upon some of his recommendations when fashioning the RFC, but she does not discuss this finding (which is uncontradicted by any evidence in the record) at all.  Dr. Kosuri is Whitehead's treating mental health professional and his opinion should ordinarily be entitled to controlling or substantial weight, absent good reasons for discounting the opinion.

"It is the ALJ's function to resolve conflicts among the various treating and examining physicians."  Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks and citation omitted).  The opinions and findings of the plaintiff's treating physician are entitled to "controlling weight" if that opinion is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'"  Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2)).  However, the opinion of the treating physician should be given great weight only if it is based on sufficient medical data.  Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (holding that a treating physician's

opinion does not automatically control or obviate need to evaluate record as whole and upholding the ALJ's decision to discount the treating physician's medical-source statement where limitations were never mentioned in numerous treatment records or supported by any explanation); Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) (holding that opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data) (internal quotation marks and citation omitted); Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment).  "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole."  Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).

An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch, 201 F.3d at 1013 (internal quotation marks and citations omitted); Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006) (holding that an ALJ may give a treating doctor's opinion limited weight

if it is inconsistent with the record).  An ALJ is entitled to give less weight to the

opinion of a treating doctor where the doctor's opinion is based largely on the

plaintiff's subjective complaints rather than on objective medical evidence.  Kirby

v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) (citing Vandenboom v. Barnhart, 421

F.3d 745, 749 (8th Cir. 2005)).

Here, the ALJ refused to give Dr. Kosuri's opinions considerable weight

because he assessed Whitehead with a GAF of 55 in his mental residual functional

capacity questionnaire (which indicates only moderate symptoms) and allegedly

had few clinical findings consistent with a complete inability to work.   Yet Dr.

Kosuri noted that Whitehead's then current GAF score was the highest it had been

in the past year, and his assessment of her condition was based on her treatment

over the course of 15-30 months.  He indicated that the severity of Whitehead's

mental impairments were demonstrated by her poor concentration, lack of

motivation, feelings of hopelessness and worthlessness, suicidal ideations, hearing

voices, paranoia, and depression.  Dr. Kosuri believed Whitehead was seriously

limited in most areas of mental abilities and aptitudes needed to perform either

skilled or unskilled labor and simply unable to meet competitive standards in other

areas.  Contrary to the ALJ's findings, his treatment notes actually provide ample

support for these conclusions and reflect that Whitehead was hallucinating, hearing

voices, paranoid, scared and panicky, stressed, and tearful at times during her sessions.  Although Whitehead reported feeling better in March of 2011, by May she was more depressed, with crying spells, difficulty sleeping, and no motivation. In December of that year, she reported being in pain and under stress, which continued through March of 2012.

Dr. Kosuri's prognosis and opinions with respect to the severity of Whitehead's limitations are consistent with the cyclical nature of Whitehead's depression as reflected in his treatment notes, and there is no inconsistency between his findings in the functional capacity questionnaire and the fact that, at the time he completed it, Whitehead's GAF score was at its highest.  "Although the mere existence of symptom-free periods may negate a finding a disability when a physical impairment is alleged, symptom-free intervals do not necessarily compel such a finding when a mental disorder is the basis of a claim."  Andler v. Chater, 100 F.3d 1389, 1393 (8th Cir. 1996).  "Symptom-free intervals and brief remissions are generally of uncertain duration and marked by the impending possibility of relapse."  Id.  Here, Dr. Kosuri's conclusions are supported by the record in this case, which shows that Whitehead's symptoms varied greatly during her regular visits with Drs. Garriga and Kosuri.  The ALJ erred in discounting Dr. Kosuri's opinions regarding the severity of Whitehead's mental limitations on this basis.

Moreover, Dr. Kosuri's findings are consistent with those of Dr. Rosso and Mary McBride.   Dr. Rosso diagnosed Whitehead with major depressive disorder and assigned her a GAF score of 40.  The ALJ assigned little weight to Dr. Rosso's opinion because he was a consultative examiner and because "the entirety of the evaluation was based on the claimant's self-reported limitations . . . ."  While it is true that, "[a]s a general matter, the report of a consulting physician who examined a claimant once does not constitute substantial evidence upon the record as a whole," Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007) (internal quotation marks omitted), in this case the consultative examiner's opinion is consistent with all the substantial medical evidence of record, including that of Whitehead's treating psychiatrist.

The ALJ also improperly discounted Dr. Rosso's diagnosis as having been based on Whitehead's recitation of events because "a patient's report of complaints, or history, is an essential diagnostic tool."  Flanery v. Chater, 112 F.3d 346, 350 (8th Cir. 1997).  More importantly, Dr. Rosso's opinions were not based solely on Whitehead's self-reported limitations.  Instead, he based his opinions on his observations of Whitehead during the examination, as well as her responses to extensive cognitive functioning tests.  Dr. Rosso reported that Whitehead displayed below average vocabulary development, intellectual functioning, verbal reasoning,

- 34 -

problem solving, arithmetic reasoning, verbal information, language functioning, short-term auditory memory, and working memory.  Dr. Rosso also observed that Whitehead had a significantly depressed affect and cried frequently throughout the examination.  These findings are all consistent with the other, substantial medical evidence of record, and it was error for the ALJ to discount them.

The same is true of Mary McBride's opinions.  While she is not a doctor, her opinions may properly be considered as part of the record as a whole.  See Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007) (explaining that under Social Security regulations, opinions from "other sources" such as clinical social workers cannot be considered an "acceptable medical source" for purposes of establishing medically determinable impairment; however, this information may be used to establish severity of the impairment and how it affects functioning).  Although the ALJ acknowledges this in her decision, she gives no weight to McBride's opinions and does not discuss them at all.  After seeing Whitehead twice a week for two months, McBride concluded that Whitehead's prognosis was poor, that she was severely limited in her ability to work, and that her depression exacerbated her perception of pain.  These conclusions were based in part on Whitehead's inability to recall serial threes during her mental status examination, to remember or appear for scheduled appointments due to depression and pain, or to respond appropriately

to basic questions about what to do in case of fire.  McBride observed that

Whitehead was unable to carry out simple instructions, had poor memory, did not

respond when people spoke to her, and did not regularly groom herself.  McBride's

observations are consistent with Whitehead's treating and consultative physicians,

and the ALJ erred in ignoring them.

In fact, the only medical evidence contradicting the above findings was that

offered by the non-examining psychological consultant Geoffrey Sutton, who

reviewed Whitehead's records and concluded on July 26, 2007, that Whitehead did

not have a severe mental impairment.  Yet, as the ALJ acknowledged, the opinion

of a non-examining consultant does not constitute substantial evidence.  See

Lacroix v. Barnhart, 465 F.3d 881, 888 (8th Cir. 2006).  For this reason, the ALJ

completely disregarded Sutton's opinions, concluding that he "did not have a

significant number of the subsequent records for review, and was in an even poorer

position than Dr. Rosso to make an accurate mental assessment."  Therefore, all the

substantial medical evidence of record indicated that Whitehead had significant

mental impairments, and that these impairments impacted her perception of pain,

her daily activities, and her ability to work.  Yet the ALJ ignored the medical

evidence and substituted her own opinion for that of Whitehead's physicians.  Ness

v. Sullivan, 904 F.2d 432, 435 (8th Cir. 1990).   In doing so, she clearly erred.

This error resulted in an improper credibility assessment under <u>Polaski</u>. Because the ALJ incorrectly found inconsistencies between Whitehead's statements to Dr. Rosso and her medical history, she improperly discounted Whitehead's credibility overall and found she was motivated primarily by secondary gain.  For example, citing these alleged discrepancies, the ALJ concluded that Whitehead "tried to make herself appear as severely limited as possible" during her testimony at the second hearing.  In making this finding, the ALJ mischaracterized Whitehead's testimony.  At the first hearing, which was held on August 12, 2009, Whitehead stated that she could pick up "maybe five or ten pounds."  (Tr. 28).  At the second hearing on April 16, 2012, in response to a question about how much she could carry on a regular basis without pain, Whitehead testified that she didn't lift or carry anything like groceries anymore because she lacked grip strength.  These are two very different questions (one is about how much Whitehead could pick up, and the other is about how much she could regularly lift or carry without pain), and there is no apparent inconsistency in Whitehead's testimony, particularly when the extended time gap between her testimony is considered.  Moreover, any perceived inconsistency may be equally explained by a worsening in Whitehead's condition instead of a motivation for secondary gain, a factor the ALJ failed to consider.  At worst, the record is simply

unclear as to the amount of weight Whitehead testified she could lift at the second hearing. The ALJ has a duty of fully and fairly developing the facts of the case, even when the claimant is represented by counsel. Bishop v. Sullivan, 900 F.2d 1259, 1262 (8th Cir. 1990). Here, the ALJ could have questioned Whitehead about any perceived inconsistencies in her testimony and clarified the record instead of simply assuming that Whitehead was motivated by secondary gain. Whether Whitehead's responses would have been a basis for bolstering or undermining her credibility is unknown, but at least the record would have been complete and the ALJ's credibility determination would have been supported by evidence in the record. Where alleged inconsistencies upon which an ALJ relies to discredit a claimant's subjective complaints are not support by and indeed are contrary to the record, the ALJ's ultimate conclusion that the claimant's symptoms are less severe than she claims is undermined. Baumgarten v. Chater, 75 F.3d 366, 368-69 (8th Cir. 1996). Here, the ALJ's credibility determination is not supported by substantial evidence as a whole.

It appears that the ALJ's improper assumption may have filtered into her assessment of other factors used to determine credibility as well. Although issues such as compliance with medication and work history may properly be considered in a credibility assessment, here the ALJ's findings on these issues seem to have

been tainted by the ALJ's incorrect assumption that Whitehead could not have been truthful with Dr. Rosso about her mental health treatment.  On remand, the ALJ should develop these and any other facts as needed to make a credibility determination based on a full and fair record.

Whitehead also contends that remand is required because the ALJ erred in her consideration of the opinions of Dr. Rosso and Dr. Garriga.  I have already concluded that the ALJ erred in her consideration of Dr. Rosso's opinions, as well as Dr. Kosuri's, so remand is required for the reasons previously stated.  As for Dr. Garriga's opinions, the ALJ accorded them only "slight weight" because "the treatment records of the claimant's treating rheumatologist, Dr. Garriga contain almost no clinical findings consistent with the crippling limitations alleged by the claimant."  She found that "there are no clinical findings reported by Dr. Garriga in any of his office notes since at least 2005 to support any of the restrictions in his medical source statement.  Instead he relies on symptoms reported by the patient such as complaints of facial rash, which only is reported once in his records, and that was after the claimant was off medications for quite some time."  She claims that "there is no imaging study showing joint abnormalities or degeneration as a result of the claimant's arthritis/immunosuppressive disorders," or any clinical findings of inflammation or limited range of motion.

These findings are contrary to the substantial weight of the evidence. Dr. Garriga's treatment notes indicate that Whitehead's symptoms included a rash on numerous occasions, including November 8, 2005, May 22, 2007, September 21, 2007, January 18, 2008, March 6, 2009, March 22, 2010, July 23, 2010, August 30, 2010, March 31, 2011, July 29, 2011, and March 19, 2012. Dr. Garriga's treatment notes also reflect additional clinical findings of dry eyes, dry mouth, dysphagia, hair loss, muscle stiffness, fatigue, swelling, and depression. These clinical findings were confirmed by other objective medical evidence, including: numerous blood tests (the most recent of which was dated March 21, 2012) indicating low WBC and strongly (+) SS-A antibodies; Whitehead's April 1, 2010, examination at the Grace Hill clinic which revealed mild changes in Whitehead's hands due to rheumatoid arthritis; and, an x-ray dated February 15, 2012, which revealed moderate to severe osteoarthritis in Whitehead's neck. Dr. Garriga is a specialist in rheumotology and has been treating Whitehead since 2003. As such, he has observed firsthand the objective signs and symptoms of Whitehead's connective tissue disease, her responses to treatment, and her continued subjective complaints. The ALJ erred when she substituted her judgment for that of Dr. Garriga's by concluding that these numerous symptoms and tests did not constitute clinical findings supporting his diagnosis. The ALJ's error was compounded by her refusal

to consider how Whitehead's depression exacerbated the severity of her symptoms. Dr. Garriga twice noted this fact, as did other examiners as previously discussed. The ALJ erred by ignoring that evidence and simply deciding that Dr. Garriga's opinions were entitled to only slight weight because some of his physical examinations of Whitehead's joints and muscles yielded normal results.

In light of the above, it cannot be said that the ALJ demonstrated in her written decision that she considered all of the evidence relevant to Whitehead's complaints or that the evidence she considered so contradicted Whitehead's subjective complaints that her testimony could be discounted as not credible. Masterson v. Barnhart, 363 F.3d 731, 738-39 (8th Cir. 2004).

Where, as here, an ALJ errs in her determination to discredit a claimant's subjective complaints and in her review of the medical evidence, the resulting RFC assessment is called into question inasmuch as it does not include all of the claimant's limitations. See Holmstrom v. Massanari, 270 F.3d 715, 722 (8th Cir. 2001). RFC is defined as "what [the claimant] can still do" despite his "physical or mental limitations." 20 C.F.R. § 404.1545(a). "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). The Eighth Circuit has noted the ALJ must

determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.  McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)).  Upon remand, the Commissioner will be given the opportunity to review all the evidence under the appropriate standards when making her RFC determination.

"Where the total record convincingly establishes disability and further hearing would merely delay the receipt of benefits, this court has ordered the immediate award of benefits without further proceedings."  Blakeman v. Astrue, 509 F.3d 878, 889 (8th Cir. 2007).  I do not think that standard has been met here, so I will remand for further proceedings as set out below.  However, in light of the fact that this case has already been remanded once, I would urge the Commissioner to commence further proceedings without delay.

I find that the ALJ did not fulfill her duty of fully and fairly developing the record and properly evaluating the evidence presented.  As a result, I cannot conclude that there is substantial evidence on the record as a whole to support the ALJ's decision.

## Conclusion

Because substantial evidence in the record as a whole does not support the

ALJ's decision, this matter is remanded to the Commissioner for a consideration of Whitehead's claim in light of all medical records on file, including an evaluation of the opinions of Whitehead's treating and consulting physicians under the appropriate standards, and development of any additional facts as needed.  The Commissioner should reevaluate Whitehead's physical and mental impairments and complaints in accordance with Polaski and order additional testing or consultative examinations, if necessary, assess a residual functional capacity consistent with the medical and other evidence, and obtain vocational expert testimony to determine whether Whitehead is capable of performing work in the national economy with her limitations.  Therefore, I reverse and remand pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Order.  See Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000) (finding that remand under sentence four of 42 U.S.C. section 405(g) is proper when the apparent purpose of the remand was to prompt additional fact-finding and further evaluation of existing facts).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is reversed and the case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order.

A separate Judgment in accord with this Memorandum and Order is entered this date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 8th day of July, 2013.